# UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| **In re:    MARGARET E. SHANK,** | Case No. 05-73943-FJS |
| Debtor. | Chapter 7 |

**MARGARET E. SHANK,**
        **Plaintiff,**

**v.**                                                                                                 APN 07-7087

**EDUCATIONAL CREDIT MGMT. CORP.,**

        **Defendant.**

___

## MEMORANDUM OPINION
___

       This matter is before the Court on Margaret E. Shank's (the "Debtor") Complaint to Determine Dischargeability Pursuant to 11 U.S.C. § 523(a)(8)(B) of her student loan debt. The Debtor alleges she sustained a back injury in a car accident in 2000. According to the Debtor, this, and the sudden death of her estranged husband in 2005, makes repayment of her student loan debt an undue burden on her and her four children. She asks that the debt be discharged.

       In response, Educational Credit Management Corporation ("ECMC"),[1] the creditor holding the Debtor's student loan note, argues that the Debtor has not proven that repayment of the loan causes an undue burden. Specifically, ECMC argues that the Debtor has not made any serious effort to obtain reasonable employment, even with her alleged injury, has unnecessary expenses and has not availed herself of the reduced repayment programs available to her. This

___
[1] See *infra*, fn. 5.

Court must determine whether the Debtor will suffer undue economic hardship if she is required to repay her student loan debt.

This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2) and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  After taking the matter under advisement, the Court makes the following Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT

*A.  Procedural History*

On July 19, 2005, the Debtor filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Code.  The Debtor's schedules included a $32,056.00 student loan as an unsecured priority debt.[2]  The Debtor's only other obligations were unsecured non-priority debts totaling $14,534.72.  The Chapter 7 trustee determined there were no assets to administer for the benefit of creditors, a discharge was granted on October 31, 2005, and the case was closed on November 4, 2005.  The Debtor did not attempt to have her student loan discharged prior to the case being closed.

On August 24, 2007, the Debtor filed a motion to reopen her case for the sole purpose of seeking to discharge her student loan, alleged to be $41,000.00.  The motion also sought the re-imposition of the automatic stay as to the student loan debt to prevent garnishment of a portion of the Debtor's income.[3]  The Court heard the motion on September 25, 2007, and granted both requests for relief.  An order to that effect was entered on October 22, 2007.

On October 18, 2007, the Debtor filed a Complaint to Determine Dischargeability of Debt (the "Complaint") requesting relief pursuant to the undue hardship exception of 11 U.S.C.

---

[2] The creditor was listed as "American Student Ast." Debtor's Vol. Pet. Sch. E.
[3] The motion also requested permission to substitute counsel, which was granted by separate order on October 22, 2007.

2

§ 523(a)(8). She named both ECMC and the United States Department of Education as defendants.

On October 30, 2007, ECMC filed an answer to the Complaint denying that the Debtor was entitled to discharge the student loan debt, requesting dismissal of the Complaint with prejudice and reimbursement of costs and attorney's fees. The Department of Education (the "DOE") did not file an answer.

At the Initial Pretrial Conference held on December 11, 2007, the Debtor moved for Default Judgment against the DOE stating that it did not answer the Complaint. In response, counsel for ECMC stated that ECMC has always had a relationship with the DOE and often represents both its own and the DOE's interests in dischargeability proceedings. ECMC requested that the Court defer ruling at this time to allow it additional time to research the issue and determine whether ECMC represents the DOE in this case. The Court did not defer its ruling, but instead denied the Debtor's request because she failed properly to serve the summons and Complaint on the DOE.[4] The Court instructed counsel for ECMC to investigate

---

[4] Fed. R. Bankr. P. 7004 and Fed. R. Civ. P. 4(a), (b), (c)(1), (d)(1), (e)-(j), (l) and (m) govern service of process for adversary proceedings. Fed. R. Bankr. Pro. 7004(a) (West 2008 rev. ed.). Service of process on the United States or any officer or agency of the United States can be effected either under the more stringent Fed. R. Civ. P. 4(i) or the easier Fed. R. Bankr. P. 7004(b)(4)&(5). When suing an agency of the United States, Fed. R. Civ. P. 4(i) requires a party to:

> serve the United States and also send a copy of the summons and of the complaint by registered or certified mail to the agency, corporation, officer, or employee.

Fed. R. Civ. P. 4(i)(2). Effective service on the United States requires a plaintiff to:

> (A)   (i) deliver a copy of the summons and of the complaint to the United States attorney for the district where the action is brought--or to an assistant United States attorney or clerical employee whom the United States attorney designates in a writing filed with the court clerk-- or
>       (ii) send a copy of each by registered or certified mail to the civil-process clerk at the United States attorney's office;
>   (B) send a copy of each by registered or certified mail to the Attorney General of the United States at Washington, D.C.; and
>   (C) if the action challenges an order of a nonparty agency or officer of the United States, send a copy of each by registered or certified mail to the agency or officer.

*Id.* at 4(i)(1).

3

with the DOE whether ECMC is representing its interests and advise the Court as to its findings.[5]

On March 12, 2008, the trial was held. The parties entered into a Joint Stipulation of facts, which was admitted into evidence and subsequently entered on the case docket. The stipulation establishes the following facts: 1) the Debtor originally had four student loans, totaling $19,604.61, 2) on March 10, 1992, the Debtor consolidated the four loans into one loan with a beginning balance of $19,604.66 (the "Student Loan"),[6] 3) the Student Loan is a qualified education loan as defined in § 221(d)(1) of the Internal Revenue Code of 1986[7]

---

Fed. R. of Bankr. P. 7004 simplifies service on the United States and its agencies. It merely requires that the summons and complaint be sent by first class mail to the civil process clerk at the Office of the Attorney General for the district in which the action is brought and to the Attorney General of the United States in Washington, D.C.

The Debtor did not follow either rule; instead she mailed by certified mail a copy of the complaint and the summons to "US Dept of Education, 400 Maryland Ave SW, PCP 9143, Washington, DC 20202" and to "Office of Inspector General, US Dept of Justice, 950 Pennsylvania Ave NW # 4726, Washington, DC 20530."

[5] Upon examination of the record during the drafting of this Memorandum Opinion and Order, the Court realized that ECMC's counsel had not provided to the Court any further information regarding ECMC's status in relation to the DOE in this case. On July 2, 2008, the Court sent a letter to ECMC's counsel directing that the information be filed with the Court and sent to opposing counsel within ten (10) days of receipt of the letter. On July 9, 2008, the Court received a letter from ECMC stating that the DOE has no "right, title or interest in Ms. Shank's student loans." ECMC suggests it would be appropriate for the Court to dismiss the DOE as a defendant in this case.

Federal Rule of Bankruptcy Procedure 7021 states that Federal Rule of Civil Procedure 21 applies in adversary proceedings. Rule 21, *inter alia*, grants the Court the authority, either on a party's motion or *sua sponte*, to drop a party from a proceeding on "just terms." Fed. R. Civ. P. 21. It appears to the Court that if an entity that has no interest in the matter has been erroneously named in a suit, it is just and efficient to dismiss that party from the proceeding. Therefore, the Court dismisses the DOE as a defendant in the instant adversary proceeding and deletes its name from the caption of the case. The remainder of this Memorandum Opinion and Order will only address ECMC as the defendant.

[6] No explanation was given regarding the five cent difference in the amounts.

[7] Section 221(d)(1) of the Internal Revenue Code defines a qualified education loan as:

(d)(1) … any indebtedness incurred by the taxpayer solely to pay qualified higher education expenses--
   (A) which are incurred on behalf of the taxpayer, the taxpayer's spouse, or any dependent of the taxpayer as of the time the indebtedness was incurred,
   (B) which are paid or incurred within a reasonable period of time before or after the indebtedness is incurred, and
   (C) which are attributable to education furnished during a period during which the recipient was an eligible student.
  Such term includes indebtedness used to refinance indebtedness which qualifies as a qualified education loan. The term "qualified education loan" shall not include any indebtedness owed to a person who is related (within the meaning of section 267(b) or 707(b)(1) to the taxpayer or to any

4

incurred by a debtor who is an individual, 4) ECMC is the proper holder of the note for the Student Loan,[8] 5) as of February 11, 2008, the Student Loan had a balance of $42,876.13 with a per diem interest cost of $6.37 based on a fixed interest rate of 9%, 6) the Debtor is a 42-year-old widow with four minor children, ages 1, 4, 9, and 12, all of whom reside with her, 7) the Debtor was last employed in 2002, and worked for the Electrical Union earning $18.60 per hour, 8) since 2004, all four of the Debtor's children have received health insurance benefits provided through Medicaid/Optima Family Health and such coverage can continue until each child reaches the age of eighteen (18), 9) the Debtor's monthly household income is $3,120.00 and is comprised solely from Social Security Survivor Benefits ($1,040.00 for the Debtor's benefit and the remaining $2,080.00 for the benefit of two[9] of her children), and 10) the Debtor's current monthly expenses total $3,707.00,[10] and are as follows:

1. $1,200.00………rent
2.    300.00………electricity
3.      45.00………gas
4.      45.00………water and sewer
5.    159.00………phone
6.    150.00………cellular phone
7.    140.00………cable TV
8.    590.00………food
9.    254.00………clothing, fun, scouts, school activities, emergency
10.    14.00………laundry and dry cleaning
11.    30.00………medical and dental expenses
12.  120.00………transportation
13.    75.00………recreation, clubs and entertainment
14.    25.00………charitable contributions
15.  236.00………auto insurance
16.  150.00………personal miscellaneous
17.  137.00………loan the Debtor obtained to cure her father's mortgage arrears

---

person by reason of a loan under any qualified employer plan (as defined in section 72(p)(4) or under any contract referred to in section 72(p)(5).

[8] Sallie Mae Trust was the lender on the Consolidated Loan and American Student Assistance was the guarantor. On July 28, 2005, American Student Assistance assigned the loan to ECMC, as successor guarantor.

[9] Explained *infra*.

[10] The Joint Stipulation lists the total as $3,717.00, but that figure is incorrect.

*B. The Evidence at Trial*

The Debtor was the only witness at the trial. She testified that she grew up in Virginia Beach, Virginia, graduated from Princess Anne High School in 1983, and then joined the Army Reserves. After completing her service in 1989, the Debtor chose to separate from the Reserves. The Debtor testified that between 1983 and 1989, she also worked for "a couple of years" at David's Cookies, as the functional equivalent of a manager. She made cookies, sold cookies, hired and fired staff and maintained the inventory.

In 1989, the Debtor married Wayne Bradford Gaus, and also began attending Commonwealth College. She testified that she took out several loans to pay her tuition, room and board, and purchase books. In 1991, after two years of study, the Debtor earned an Associate's Degree in Applied Science.[11] She then consolidated her separate loans into the Student Loan.

In 1995 or 1996, the Debtor obtained her electrician's certification from a vocational-technical school.[12] For the next five years she and her husband, also an electrician, worked in their chosen field, each earning approximately $40,000 to $50,000 each year.

The Debtor testified that in 2000, her household income increased when the her husband accepted a position as a telephone operator with Verizon and began earning between $70,000 and $90,000 annually. However, she stated that the increase was short lived because the couple separated that same year.

Also during 2000, the Debtor testified that she was involved in an automobile accident, which resulted in an injury to her back.[13] Specifically, she stated that the accident caused the

---

[11] The Debtor testified that she had planned to further her education by transferring her Associate's Degree credits to another institution, but the other schools refused to accept them because Commonwealth College was not properly accredited.

[12] The Debtor did not borrow any additional student loan money to obtain this certification.

development of two bone spurs that press on the nerves in her back, causing her pain and discomfort.

The Debtor stated that the injury prevented her from working for almost a year and that when she did finally return to work in 2001, she immediately reinjured her back because of the strenuous nature of her electrician's job. After this second injury the Debtor determined she was unable to continue her work as an electrician.

The Debtor testified that she then attempted to secure other less strenuous employment with comparable pay, but was ultimately unsuccessful. She explained that from the outset her job search was impeded by a lack of childcare, her back injury and her lack of marketable skills. The best wage she was offered was $6.00 to $8.00 per hour, and given the cost of childcare, the Debtor determined that accepting such low paying positions was not economically feasible. Eventually, she stopped looking for employment altogether.

The Debtor testified that recently, however, she resumed her job search, but just as before, the lack of childcare has severely hampered a rigorous search. She also stated that the types of jobs for which she qualified, and their accompanying pay, has changed little since 2001. The Debtor estimated that in today's market she would be fortunate to earn $8.00 to $9.00 an hour. She stated that, just as she discovered during her previous job search, her limited earning potential would barely cover her child care costs, estimated to be between $400 and $650 per month.[14] Consequently, the Debtor is not working at this time and, in fact, has not worked since 2000.

---

[13] The Debtor admitted during her testimony that the accident was her fault, leaving her with no personal injury claim to pursue to compensate for her injuries or time lost from work.

[14] The Debtor based this estimate on the range of rates she was quoted for full-time care for an infant and a toddler and after-school care for a 9- and 12-year-old.

7

On cross-examination, however, the Debtor contradicted her previously stated desire to obtain employment when she testified that she wanted to be a stay-at-home mom until all four of her children complete school. She also confirmed that in approximately four years all of her children will be attending school, which would leave her with ample opportunity to work, unless, as the Debtor pointed out, her four-year-old child, who has a speech impediment, is diagnosed with other disabilities that delay her entering school.

The Debtor also admitted that at no time since 2000, has she sought any jobs in the electronics field that were less physically demanding than the ones she previously held, nor any sort of management position, comparable to the one she held at the cookie store in the mid- to late-eighties.

In 2005, the Debtor's estranged husband died of a heart attack at thirty-eight years old. According to the Debtor, she was not eligible to receive any life insurance distributions at the time of his death, but that she and two of her four children[15] are entitled to and actually receive monthly Social Security Survivor Benefits totaling $3,120.00.[16] These benefits constitute the Debtor's only means of financial support at this time.

The Debtor testified that the only child support she has ever received was from her estranged husband during 2000 and 2001, while the couple "battled it out" in court. Despite two years of proceedings, however, the Debtor stated that no order for child support was ever issued by the court, a fact that she admitted she has never understood. Consequently, from 2002 until his death in 2005, the Debtor's estranged husband[17] paid her nothing to care for their

---

[15] The Debtor maintains that her third child was fathered by her estranged husband, but he questioned paternity and died before it could be established. Therefore, that child is not eligible to receive the survivor benefits. The Debtor's stated that her fourth child was not fathered by her estranged husband.

[16] Each person currently receives $1,040.00 per month.

[17] The record is unclear as to the legal status of the marriage at the conclusion of the above-referenced two year legal battle, so the Court will continue to refer to the couple as estranged.

8

children.. Counsel for ECMC asked the Debtor why she did not continue to seek a legal order for child support during those three years. The Debtor indicated that she wanted to do just that, but lacked the necessary financial resources. She explained that because she had been unable to pay her prior counsel for his representation from 2000 to 2001, she was unable to find another attorney willing to take her case.

As for the financial support of her fourth child, the Debtor testified that she has not sued for child support, but rather is currently informally mediating with the child's father as to an acceptable amount of support.[18] According to the Debtor, her social worker began mediating the issue in 2006, when the Debtor mentioned she was not receiving any child support for the baby. The Debtor stated that the father has offered her $75.00,[19] which she deemed unacceptable. She quickly pointed out, however, that any offer the father made would be impractical because he had been unemployed for eight months and had no prospects for work in the future. When asked why she had not sought an enforceable court order for child support, the Debtor testified that she has not had time to do so because of her full-time parenting responsibilities. She reiterated that it is difficult to find someone she trusts to watch her children for free.

The Debtor testified that she takes advantage of several government sponsored benefit programs to help stretch her budget. For example, all four of her children have health insurance through the Medicaid program and the two younger ones are enrolled in the Women, Infants, and Children ("WIC"), a program that provides certain nutritional foods, such as eggs, milk, and cheese to children, ages 0 to 5, enrolled in Medicaid. The Debtor stated she has no

---

[18] The putative father of this child is someone other than the Debtor's deceased husband.
[19] The Debtor did not state whether this figure was per week or per month.

health insurance as she is not eligible for Medicaid because of the amount of her household income and that she receives no other public assistance.

Between the years 1991 and 2000, when the Debtor's household income was between $80,000.00 and $100,000.00, she testified that she paid a total of $3,000 to $4,000 against her Student Loan through inconsistent payments. She explained that as an electrician working through the Union, jobs were sporadic, as was the pay. The Debtor testified that she paid her scheduled Student Loan payment – or more if she had it - when the money was available. Further, the Debtor exercised all of the deferments available to her during this time.

Since 2000, the Debtor testified that her budget simply has not allowed her to make her Student Loan payments. Eventually, she contacted ECMC and negotiated a reduced payment schedule of $15.00 per month. She said that an ECMC representative told her that she would pay $15.00 per month for seven to nine months and then another company would take over the loan, at which time the payment might increase, but it was doubtful. The Debtor agreed to the terms over the phone and subsequently made her first $15.00 payment. However, when she received the paperwork effectuating the temporary payment reduction in the mail from ECMC and "read the fine print,"[20] the Debtor decided that the program would not work for her because it was likely that at the end of the seven to nine month reduced payment period her payment would increase. The Debtor stated that even though no one had given her any information about whether and how much her payment might increase after the seven to nine months, she knew that it would be beyond her means; therefore, she did not sign the agreement and made no further payments under the reduced payment plan. Upon further inquiry by

---

[20] The Debtor identified what she termed the "fine print" as the wording in bold letters in paragraph 8 of the Terms and Conditions section of the Rehabilitation Loan Program Repayment Agreement. Pl. Ex. 1, p. 8, ¶ 8. The provision reads as follows: "**This means that if the borrower's loan(s) is rehabilitated there is a possibility that the required monthly payment amount will be increased.**" *Id.*

10

ECMC, the Debtor admitted that she could have afforded an increase to $20.00 or $25.00, but that a payment of $50.00 per month would have been beyond her means.

Later, despite her testimony above that she actually negotiated and received paperwork[21] for a reduced monthly payment amount, the Debtor claimed she was completely unaware that she could repay her Student Loan through alternative repayment programs.

The Debtor testified that most often her bills exceed her income each month. Occasionally, she stated she has a surplus of $40.00 to $50.00 a month. She testified that she lives in a two-story home owned by her father. She pays rent and utilities in the amount of $1,200.00 per month. She stated that she shops at second hand stores to save money. The debtor has both cable ($75 per month for basic and basic plus service), and high-speed internet ($65 per month), which she deems necessary for her school age children. She stated she has a landline telephone ($159.00 per month), but stated it is not practical or economical to use it for a dial-up internet connection through a land line as she needs to have access to the phone while her children are working on the computer. She stated that her phone bill is high because she has relatives that live in Canada, whom she calls on holidays. Additionally, the Debtor pays $150.00 per month for two cellular telephones, one for her and one for her father.

The Debtor also pays $137 each month on a $5,000 or $6,000 loan she obtained from her credit union to cure her father's mortgage arrearages on another piece of property he owns. The Debtor stated that there was no legal obligation that required her to cure the arrears, but that she felt a moral obligation to help her father, who had helped her so many times before.

---

[21] The paperwork, which the Debtor testified she read, specifically references the Income Contingent Repayment Program as an option for repayment.

11

On her schedules, the Debtor listed an expense of $25 per month in charitable donations, but upon cross-examination she admitted that she does not actually give $25.00 in cash, but rather makes an in kind donation of clothing and other items each month.

The Debtor explained that the $75.00 expense for "recreation, clubs, entertainment" includes swimming lessons, skating lessons, and tae kwon do lessons, all of which she deems necessary as these activities improve the children's confidence and self-esteem. She stated that the $150.00 expense for "personal miscellaneous" items included personal hygiene products, which were not included in her food budget of $590.00.

On direct examination, the Debtor testified that she does not expect any increase in income in the next five to ten years, but does expect that her expenses will rise as her children grow older. On cross-examination, however, the Debtor agreed that over that same time period her financial situation would improve, at least with the addition of child support from her fourth child's father.

Finally, the Debtor testified that she has made every attempt to repay her Student Loan, but simply does not have the resources to do so. She stated that she finally decided to seek to discharge the debt when she received a letter from the Treasury Department indicating that ECMC was going to begin garnishing her social security check. Pl.'s Ex. 4.[22] She stated she received one check that had $450.00 deducted from it, at which time she contacted her attorney and reopened her bankruptcy case to stop the garnishment. The Debtor further testified that she will not be able to meet her household expenses if the garnishment begins again. Upon completion of her testimony, the plaintiff rested.

---

[22] This letter was admitted for the limited purpose of proving the Debtor received it and not for the truth of the information contained in the letter.

12

ECMC produced no witnesses. None of its proposed exhibits were admitted into evidence, due to the Debtor's objections, which were sustained by the Court.

The Court then inquired of ECMC whether the Debtor remains eligible for this temporary payment reduction program given these proceedings. Counsel for ECMC assured the Court that this suit has no impact on the eligibility of this Debtor, or any debtor, to participate in loan rehabilitation programs or the like. In fact, Counsel volunteered to inquire of client, ECMC, and the DOE as to the Debtor's eligibility for the ICRP and report his findings to opposing counsel and to the Court. Accordingly, on March 27, 2008, counsel for ECMC sent a letter to Debtor's counsel with a copy to the Court outlining the Income Contingent Repayment Program (the "ICRP") under the William D. Ford Loan Consolidation Program, for which the Debtor is eligible. According to the letter, under the ICRP monthly loan payment amounts are based solely upon household income and that Social Security benefits are only counted towards household income to the extent they are taxable. The letter concludes that, based on the testimony at trial, for the purposes of the ICRP the Debtor's income would be calculated at $0.00, resulting in a monthly payment of $0.00 as well.

At the conclusion of the trial the Court reminded the parties that the law regarding student loan dischargeability in this circuit is well established, and, in fact, that the Fourth Circuit Court of Appeals, in *Educational Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319 (4th Cir. 2008), recently reiterated the very stringent standards a debtor must meet in order to do so. Consequently, the Court directed that post-trial briefs specifically address the ruling in *Mosko* and its application to the facts in this case.[23]

---

[23] On March 21, 2008, the Debtor submitted her post-trial opening brief. On April 9, 2008, ECMC filed its post-trial rebuttal brief, followed by the Debtor's reply brief filed on April 18, 2008.

13

The Court also encouraged the parties, in the interim, to engage in meaningful dialogue to determine whether a mutually satisfying resolution was attainable.

On May 22, 2008, the Court convened a status conference, *sua sponte*, to ascertain if the parties had been able to come to a resolution, especially given ECMC's March 27, 2008 letter. Debtor's counsel indicated that settlement was not possible and that the Debtor preferred to have the Court rule on her case.

## II. CONCLUSIONS OF LAW

In this Circuit, Courts have had numerous opportunities to examine and explain the general rule of excluding student loan debt from discharge in bankruptcy and the very narrow undue hardship exception to this rule. *See Educ. Credit Mgmt. Corp. v. Frushour (In re Frushour)*, 433 F.3d 393, 399 (4th Cir. 2005), *Ekanesi v. Educ. Res. Inst. (In re Ekanesi)*, 325 F.3d 541, 545 (4th Cir. 2003), *Kielisch v. Educational Credit Mgmt. Corp. (In re Kielisch)*, 258 F.3d 315, 319 (4th Cir. 2001), *In re Gill*, 326 B.R. 611, 624 (Bankr. E.D. Va. 2005), *Harkins v. Educ. Credit Mgmt. Corp. (In re Harkins)*, 2006 Bankr. LEXIS 813 (Bankr. E.D. Va., Apr. 27, 2006). The rationale for the rule and the undue hardship exception are so thoroughly discussed in the previously mentioned cases that the Court sees no reason to reiterate them at length here.

The Fourth Circuit has adopted the test found in *Brunner v. N.Y. State Higher Educ. Servs. Corp. (In re Brunner)*, 381 F.2d 395 (2d Cir. 1987), to determine whether repaying a student loan causes an undue hardship on a debtor in Chapter 7 case. *In re Frushour*, 433 F.3d 393 at 400. Only if repaying a student loan causes an undue hardship may the debt be

14

discharged in bankruptcy. *Frushour*, 433 F.3d at 400. Under the *Brunner* test the Debtor must prove:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396. The Debtor must prove each element of undue hardship by a preponderance of the evidence. *Frushour*, 433 F.3d at 400.

The Fourth Circuit Court of Appeals recently had occasion to revisit the issue of the undue hardship exception to the nondischargeability of student loan debt in *Mosko*. *In re Mosko*, 515 F.3d 319. There, the Fourth Circuit reversed both the bankruptcy and district courts' rulings when it reiterated its adoption of not only the three-part *Brunner* test, but also the five-part analysis of the good faith part of that test. *Id.*

Preliminarily, the Fourth Circuit noted that the *Brunner* test is conjunctive; if any of the three prongs is not met, the student loan debt is nondischargeable. *Id.* at 324. Because the court found that the debtors failed on the issue of good faith, it did not analyze the other two prongs of the test. This Court will proceed on identical course, as it finds that the Debtor here has also failed to meet the good faith part of the *Brunner* test.

Good faith is comprised of "the debtor's efforts to obtain employment; maximize income, minimize expenses, […and] seriously pursue loan consolidation options." *Id.* at 324 (quoting *O'Hearn v. Educ. Credit Mgmt. Corp.*, 339 F.3d 559, 564 (7th Cir. 2003) (internal quotation marks omitted). "Furthermore, a debtor may not 'willfully or negligently cause his

15

own default, but rather his condition must result from factors beyond his reasonable control.'"
*Id.* (quoting *In re Frushour,* 433 F.3d at 402).

The Debtor in this case has failed to meet her burden of proof as to these components of good faith.  Even with her back injury, which the Court understands eliminates certain jobs immediately, the Debtor admitted that she has done very little to find another job.  The Debtor is a trained and certified electrician; it would seem that a less strenuous job in that field would have been the first type of position she would have sought.  Such a position that requires that type of technical skill would certainly have paid more than the minimum wage jobs for which she was applying.  With a somewhat comparable salary and her and her children's social security benefits, the Debtor would have been in a position to consistently pay her monthly student loan payment.  However, she admits that she never even attempted to find such a job.

Additionally, the Debtor admits that she never applied for a position comparable to the management-type position she held at David's Cookies.  The Court recognizes that the Debtor held that job approximately twenty years ago, but the Court does not believe that the skills the Debtor utilized in that position have diminished.  In fact, she may even be a better manager today given that since she last held that type of position the Debtor has completed an Associate's Degree and an electrician's certification course.

Furthermore, not only did the Debtor fail to seek the types of jobs that utilized her skills and could have provided her with higher pay, she admitted that after her initial, and as this Court finds, cursory search she stopped looking for *any* job at all. The Court understands the child care issue, but the Debtor offered no evidence as to exactly how many people she asked to watch the children, or how many times, or whether she inquired about childcare programs for which she might be eligible.  Furthermore, the Debtor did not take advantage of the internet

16

connection she had in the home to search and apply for jobs that way. This Court finds that the Debtor failed to prove that she made any serious attempt to obtain employment from 2000 to the present. Of course, the same analysis applies when determining whether the Debtor acted to maximize her income. If she did not attempt to obtain a job, it must necessarily follow that she did not attempt to maximize her income, and the Court so finds.

The last part of the good faith analysis is the minimization of expenses. The Court does not have to look far to see that the Debtor fails this part of the test as well.

While the Court could address some of the Debtor's expenses that arguably could be reduced, such as the rent and the personal miscellaneous expenses, we will refrain because there are other expenses that without question could be reduced or eliminated totally. Failure to reduce or eliminate these expenses disqualifies this Debtor from the undue hardship exception.

First, the Debtor's landline telephone bill of $159.00 per month is excessive. The Debtor testified that her bill is so high because of the long distance phone calls she makes to relatives in Canada during the holidays. This is precisely the type of expense that can be reduced or eliminated from the Debtor's budget especially considering the extraordinary relief she is asking the Court to grant her. While it may be somewhat painful to eliminate or significantly decrease phone calls to relatives living far away, that is exactly what must be done when money is limited and there are other bills to pay. This Court finds that such phone calls are not a necessary living expense in this case.

Most importantly, in conjunction with the landline, the Debtor also pays $142.00 per month for two cell phones, hers and her father's. There is no question that this expense is duplicative with the payment for a landline telephone, and one of these expenses could be

eliminated from the Debtor's budget. If the Debtor feels that she must have a cell phone because of her children then she could discontinue the landline and still reduce her budget. Additionally, if she only uses the cell phone for emergency purposes as stated, the Debtor can opt for the least expensive monthly plan available for her line. As for the Debtor paying for her father's cell phone, there is no plausible explanation that would allow for this expense in the Debtor's budget while discharging her student loan debt.

The Debtor's $140.00 expense for cable television and internet connection is another that is excessive considering the type of relief for which she is asking. The standard for minimizing expenses when seeking to discharge student loan debt is very clear; the Debtor must do everything to eliminate all excess spending from her budget before she can be excused from repaying her educational loans. With four young children at home, the Court understands why the Debtor may *want* cable television and high-speed internet, but those expenses are not necessary to maintain a minimal standard of living.

Finally, the Debtor is repaying a loan she obtained to help her father cure mortgage arrears on the home where he resides. The Debtor testified that she does not live with her father, but rather rents a second home from him. Consequently, if the bank had foreclosed on her father's home, it would not have caused any harm to her family, other than possibly making room for her father in his own home. This might have been inconvenient to the Debtor, but that is not the test for dischargeability of student loan debt. The Court understands and appreciates the Debtor's sense of moral obligation to help her father, but she had no legal obligation to borrow the money to repay her father's mortgage arrears. However, this is an expense that the Debtor chose to add to her budget, a budget that was very tight already. This

18

Court can not allow the Debtor, under the standards articulated in *Mosko*, to repay this loan she voluntarily took on, but discharge her student loan debt.

In her post-trial briefs, the Debtor states that ECMC has provided no evidence showing that the Debtor has failed to attempt to gain employment, maximize her income or minimize her expenses, but those burdens do not fall on the defendant. It is the Debtor who must prove that she has done all three. She has not carried her burden of proof.

Finally, the Debtor argues in her post-trial briefs that ECMC is improperly attempting to substitute the Debtor's participation in a reduced payment program as the test for good faith. The Court believes that the Debtor is misstating ECMC's argument and ignores the inclusion of the Debtor's participation in these types of programs in the good faith analysis. The Fourth Circuit has twice stated that "'seeking out loan consolidation options is 'an important component of the good-faith inquiry' because such efforts demonstrate that the debtors take their debts seriously and are doing their utmost to repay them despite their unfortunate circumstances." *In re Mosko,* 515 F.3d at 326 (quoting *In re Frushour*, 433 F.3d at 402).

In the instant case, the Debtor made arrangements to participate in a reduced payment program with payments of $15.00 per month, but stopped after making a single payment. Her stated reason for discontinuing in the program was that the servicer of the loan could not tell her what her payments were going to be after the initial nine-month reduced payment period. Rather than make the payments she could afford, the Debtor made the decision to stop after determining – based on no evidence or facts – that she would not be able to afford the payments at least eight (8) months in the future. The Court cannot find that such behavior constitutes a good faith effort to repay the loan. Additionally, while the Debtor did utilize all of her forbearances and deferments to prevent the loan from defaulting, such behavior alone

19

without making "reasonable efforts" to repay the loans after the forbearances and deferments terminate, is not enough to establish good faith.  *In re Mosko*, 515 F.3d at 327.

Accordingly, we find that the Debtor has failed to meet her burden of establishing good faith in her effort to repay her student loan.  As stated earlier, under the *Brunner* good faith is one part of a three part conjunctive test to determine student loan dischargeability.  The Debtor's failure on any one part means failure overall.  Consequently, no discussion of the other two parts is required.

### III. CONCLUSION

For the reasons stated above, the Court finds that the Debtor is not entitled to discharge her student loan debt.  A separate Order will issue.

Norfolk, Virginia

                                                                                                FRANK J. SANTORO
                                             United States Bankruptcy Judge

Copies to:
    Timothy V. Anderson, Esquire
    Anderson Good, P.C.
    2396 Court Plaza Drive, Suite 200
    Virginia Beach, VA  23456

    Rand L. Gelber, Esquire
    One Church Street, Suite 802
    Rockville, Maryland 20850